LINDA M. McCONNELL,               )
                                  )
        Plaintiff,                )
                                  )    No. 04 C 3705
    v.                            )
                                  )    Judge John W. Darrah
JEAN IOVINO, BARBARA BOERSMA,     )
CONNIE POWERS, ARMENE HAMIDI,     )
CRAIG DANNENBRINK, and SARAH ENKE,)
                                  )
        Defendants.               )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Linda M. McConnell, filed a two-count Amended Complaint, alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Count I alleges a violation of 18 U.S.C. § 1962(c) for underpayment of bonus and profit-sharing incomes and over-deduction of insurance premiums in McConnell's paychecks. Count II alleges conspiracy pursuant to 18 U.S.C. § 1962(d) against all Defendants for conspiring to conceal McConnell's intended termination. In March 2006, judgment on the pleadings was granted in Defendants' favor as to Count II. Presently before the Court is Defendants' Motion for Summary Judgment as to Count I.

## BACKGROUND

Starting in 1985, Jean Iovino, Barbara Boersma, and Christina Wilkins acquired four Sylvan Learning Centers in Cincinnati, Ohio. These centers were operated together until early 1994, at which time Iovino and Boersma no longer had a financial interest in the Ohio centers. (Def.'s 56.1(a)(3) Statement ¶ 5). In 1992, WIB, Chicago (owned at that time by Iovino, Boersma, and Wilkins) began operating Sylvan Learning Center franchises in the Chicago area. (Id., ¶ 6). After the Sylvan franchisor acquired the Britannica Learning Centers, including one in Chicago Ridge, WIB merged

that center into WIB's existing Evergreen Park Sylvan Learning Center. The Center Director for the Chicago Ridge Britannica Center had been Linda Gavin, now known as Linda McConnell. WIB retained McConnell as the Center Director of that facility. In 1994, WIB moved the Evergreen Park Center to Oak Lawn, Illinois. (Id., ¶ 7).

In 1996, WIB became Iovino Boersma Enterprises, Inc. ("IBE"). From 1996 to 2004, IBE owned and operated seven to eight Sylvan Learning Centers in the Chicago area as a franchisee. (Def.'s 56.1(a)(3) Statement ¶ 8). In July 2005, IBE sold all of its Sylvan Learning Centers to the franchisor. IBE is no longer an operating company. (Id., ¶ 9).

Robert Herrmann performed the accounting work for IBE from 1994 through 2005, initially as an employee of a Naperville accounting firm and then on his own. (Def.'s 56.1(a)(3) Statement ¶ 11). Each month, Herrmann prepared financial statements for IBE, including profit and loss statements for each of the Sylvan Learning Centers. The profit and loss statements for each center contained the net operating income (or "earnings") figures from which most of the IBE profit sharing was based. The financial statements and profit and loss statements for the centers operated by Iovino and Boersma or IBE, both in Chicago and Ohio, were always prepared on an accrual basis. (Id., ¶ 12). The profit and loss statements were derived primarily from revenue numbers provided by the individual center directors and expense records provided primarily from the IBE corporate office. Each month, McConnell put together a packet of reports for the Oak Lawn Center that included the Licensee Monthly Report containing cash revenue numbers to be submitted to the franchisor, an accrual revenues report, and bonus forms for the directors at the Oak Lawn Center. (Id., ¶ 13). The expense numbers were primarily from the accounts payable detail provided by Maria Iosco, IBE's administrative assistant. The expenses were recorded, to the extent possible, based on the month in

2

which they were incurred rather than when they were paid. (Id., ¶ 14).

IBE paid royalties and some of its advertising expenses to the Sylvan franchisor. WIB initially made those payments to Sylvan based on accrual revenues. In 1995, Sylvan switched to allowing reports and payments based on cash or accrual; and, in late 1995, Sylvan required that all royalties and advertising payments be based on cash revenues. (Def.'s 56.1(a)(3) Statement ¶ 15). Each month, McConnell received and reviewed the Department Statement of Operations for the Oak Lawn Center. (Id., ¶ 16).

As a Center Director, McConnell was entitled to various bonuses, commissions, and profit sharing pursuant to written agreements or plans. From its inception, IBE had profit-sharing plans for its directors, including Center Directors. McConnell identified eight directors at the Oak Lawn Center during the previous six years that were eligible for profit sharing. (Def.'s 56.1(a)(3) Statement ¶ 17). IBE changed its profit-sharing plans from time to time, sometimes effective January 1 of a year and sometimes effective at a different time of the year. Each of the profit-sharing plans was in writing and allowed for changes at any time. (Id., ¶ 18).

Until 2004, each of the IBE profit-sharing plans was based on the net operating income or earnings of the center in which the director worked. The net operating income was derived from the profit and loss statement of each center, which was prepared by Herrmann. IBE only had financial statements on an accrual basis and never prepared financial statements or profit and loss statements on a cash basis. All of the profit-sharing plans were based on accrual earnings. McConnell knew that the net operating income, for purposes of determining her profit sharing, was from the financial statements that she received each month and that she could check her profit sharing if she looked at the financial statements and performed a calculation. McConnell also knew that "earned revenue"

3

meant accrual revenue. (Def.'s 56.1(a)(3) Statement ¶ 21). McConnell received her profit-sharing plans and reviewed them upon their receipt. (Id., ¶ 22).

The profit-sharing calculations were performed by Herrmann pursuant to an Excel spreadsheet that he created. The spreadsheet reflected the current profit-sharing formulas. Neither Iovino nor Boersma had copies of the spreadsheets or formulas. (Def.'s 56.1(a)(3) Statement ¶ 23). Each month, after the financial statements were completed, Herrmann inserted the net operating income for each center into the spreadsheet, and the spreadsheet calculated the profit-sharing amount. Herrmann sent the preliminary financial statements to Iovino to review but only sometimes sent her preliminary profit-sharing numbers. Iovino reviewed the draft statements; and, if changes were made to those statements, Herrmann would create revised profit-sharing calculations. Iovino sometimes reviewed the profit-sharing statements to make sure that the appropriate directors were receiving the correct portion of their center's profit sharing. Iovino did not check the mathematical calculations because those were done on Herrmann's spreadsheet. Once reviewed, Herrmann would provide the profit-sharing numbers to Iosco for inclusion in payroll. (Id., ¶ 24).

The profit sharing was generally paid shortly after the close of the following month, along with an employee's base salary. (Def.'s 56.1(a)(3) Statement ¶ 26). Directors sometimes had questions about the amount of profit sharing they had received. In those situations, the calculation was checked, and the basis for the amount of profit sharing was explained. If an error was identified, the error was corrected. (Id., ¶ 27). Sometimes there were errors in Herrmann's calculations of the monthly profit sharing. For example, when the profit-sharing plan changed in January 2000, the primary difference was that the 11 percent tier started at $5,000 instead of $4,000. Herrmann failed to change his worksheet to reflect this change; and, thus, for each month in 2000 and 2001, the profit-

4

sharing calculation for McConnell was overpaid by approximately $25.00. (Id., ¶ 29). There were also occasional errors or discrepancies in the payment of profit sharing due to a variety of mathematical, clerical, or timing issues. For example, McConnell's profit sharing for January 1999 should have been $381.74, but her pay stub reflects that she received $2,353.55 in profit sharing. If mistakes were found after payroll had been completed, Herrmann either issued a manual check or made an adjustment in a later month. Small mistakes in an employee's favor were not adjusted. (Id., ¶ 29).

Based on Herrmann's calculations, McConnell's profit sharing was overpaid a total of $1,054.05 from January 1999 through December 2003. Based on Herrmann's calculations, McConnell's profit sharing was correctly paid for January and February 2004. McConnell disputes Herrmann's calculations. (Def.'s 56.1(a)(3) Statement ¶¶ 30-32; Plaint.'s Response ¶¶ 30-32). During her employment at IBE, McConnell never checked to see if her profit sharing was accurately calculated. On at least three or four occasions, McConnell asked Herrmann why the revenue numbers on the financial statements were different than the numbers on the Licensee Monthly Reports; and Herrmann explained the cash/accrual difference to McConnell. (Id., ¶ 33).

IBE also provides various bonus plans for Center Directors. The bonus plans varied over McConnell's tenure. Each bonus plan is described and governed by a written bonus plan. The bonus plan generally changed at the beginning of the calendar year but sometimes changed during the calendar year. (Def.'s 56.1(a)(3) Statement ¶ 34). One of the bonuses for which Center Directors were eligible was a Length-of-Stay Bonus ("LOS Bonus"). The LOS Bonus was based on students that remained in the Sylvan Learning Center program for a specified period of time. Another bonus was based on the amount of Prepay or "SLM" students. (Id., ¶ 35). In order for a director to receive

5

either the LOS or Prepay Bonus, that director was required to complete a bonus form that identified each of the students for whom the director was entitled to a bonus. The director and another director from the same center were required to sign the form. McConnell completed these forms and checked their accuracy. (Id., ¶ 36). McConnell included the completed bonus forms with the monthly packet of reports she had prepared. Boersma checked the calculations and added any adjustments to the bonus that was due. Boersma then sent the bonus numbers to Iosco to be included in payroll. (Id., ¶ 37). McConnell sometimes questioned the amount of bonuses or how they had been calculated. McConnell could not identify any instances in which a question about bonus calculations was not resolved. (Id., ¶ 38).

McConnell once asked Connie Powers of IBE to investigate the amount of labor that had been allocated to the Oak Lawn Center for purposes of the bonus calculations. Powers investigated and learned that there had been an error in the amount of labor allocated, and an adjustment was made. (Def.'s 56.1(a)(3) Statement ¶ 39). While employed at IBE, McConnell never checked to see whether her bonus was accurately calculated. (Id., ¶ 40). McConnell was unable to identify any bonus calculation that was incorrect and did not have any basis for claiming that the bonus calculations were incorrect. (Id., ¶ 41).

From July 1999 through the end of 2001, IBE paid Center Directors commissions. (Def.'s 56.1(a)(3) Statement ¶ 42). The commissions were paid pursuant to, and governed by, written commission plans that were signed by the Center Directors. Pursuant to the commission plans, McConnell was entitled to a flat 4.4 percent of the "total accrual revenue per financial statement" of the Oak Lawn Center. (Id., ¶ 43). Herrmann performed the commission calculations and then directed IBE how much should be paid in commission to each Center Director. Iovino and Boersma

did not check Herrmann's calculations. (Id., ¶ 44). Occasionally, directors questioned the calculation of their incentive pay. In each instance, the underlying information was checked. If an error was found, an adjustment was made. (Id., ¶ 49).

In March 2003, IBE offered additional insurance to their employees, at the employee's expense, through AFLAC. (Def.'s 56.1(a)(3) Statement ¶ 50). McConnell chose five different insurance policies from AFLAC. After McConnell completed and signed the Premium Deduction Authorization ("PDA"), AFLAC filled in the appropriate premiums for each of the policies requested. One copy of the PDA was given to McConnell, and one was given to IBE so that IBE would know the amount of premiums to deduct from McConnell's pay. (Id., ¶ 51). AFLAC told IBE that it should use the premiums in the PDA for purposes of payroll deductions and that AFLAC would provide notice to IBE if the premiums changed. Using the premium amounts contained in the PDA forms, IBE provided for the premium deductions through the payroll provider, Advanced Data Processors, Inc. ("ADP"). Each month IBE made a lump sum payment to AFLAC for the total of all premiums. The invoices from AFLAC and payment of those invoices were handled by Iosco. IBE did not check the amounts on the AFLAC invoices to IBE against the amounts being withheld from an employee's pay. (Id., ¶ 52).

McConnell originally applied for cancer coverage through AFLAC. Coverage was denied because of previous health problems. AFLAC informed McConnell of the denial of cancer coverage but did not inform IBE that the coverage had been denied by AFLAC. (Def.'s 56.1(a)(3) Statement ¶ 53). AFLAC mistakenly identified McConnell's premiums as $78.40. When AFLAC sent McConnell her insurance policy, it identified the correct premium of $49.60. Neither AFLAC nor McConnell notified IBE of the error. (Id., ¶ 54). The invoices AFLAC provided to IBE correctly

charged the $49.60 premium. (Plaint.'s Response ¶ 54).

McConnell did not check whether the amounts deducted from her pay were the same as the amounts stated on the insurance policies she had received from AFLAC because she assumed that they were correct. (Def.'s 56.1(a)(3) Statement ¶ 55). After McConnell's employment was terminated and Iovino attempted to reconcile McConnell's final paycheck, Iovino noticed the discrepancy between the amount being deducted from McConnell's pay and the amount being charged by AFLAC. (Id., ¶ 56). Iovino contacted AFLAC and requested that AFLAC determine the correct premium ammount. On May 20, 2004, AFLAC sent a letter to McConnell, advising her of the mistake in the amount due for coverage. On May 27, 2004, IBE sent McConnell a letter and check for $841.35 for the monies that had been overwithheld. McConnell has refused to cash the check. (Id., ¶ 57). On June 11, 2004, AFLAC sent a letter to IBE, advising IBE that IBE was "properly deducting what the employees have authorized for AFLAC premiums." AFLAC stated that it had "concluded that all errors in billing were discrepancies between what the employee signed off on and what AFLAC is charging for the requested policies." The letter concluded that as to McConnell, AFLAC "never received an updated payroll card, so you were correct in keeping the deductions she authorized on the payroll card dated March 26, 2004." (Id., ¶ 58).

IBE had advertising expenses that it paid to either the Sylvan franchisor or a local co-op based on revenues in addition to other advertising and promotional expenses. Herrmann calculated the accrual advertising expenses for each of the seven centers and included them in worksheets each month. Herrmann was provided details concerning each of the additional advertising expenses that could be allocated to a center. The payments to the franchisor and co-op were initially based on accrual revenue; but, as of 1996, they were paid based on cash revenue. Like the revenues and other

8

items on the profit and loss statements, advertising and promotional expenses were recorded by IBE on its financial statements on an accrual basis. (Def.'s 56.1(a)(3) ¶ 67). Herrmann reviewed the advertising and promotional expenses of the Oak Lawn Center for a thirty-month period. The advertising and promotional expenses on the monthly profit and loss statements of the Oak Lawn Center exactly matched the advertising and promotional expenses in the IBE financial records for twenty five of the thirty months. In the other five months that did not match, two resulted in McConnell's receiving $73.53 more in profit sharing than she was entitled, and one resulted in her receiving $11.33 less in profit sharing than what she was entitled. In the other two months, the advertising and promotional expenses on the financial statements were higher than actually incurred; but the Oak Lawn Center's net operating income for these two months was so low that, even with the lesser expense, McConnell would not have received any profit sharing for these two months. (Id., ¶ 68).

McConnell and other directors were paid monthly through direct deposits to their bank accounts. IBE used the services of ADP for payroll. Each month IBE reported each employee's profit sharing, bonuses, and other adjustments to payroll to ADP. The payroll numbers from each center were submitted to IBE by the Center Director, including McConnell. (Def.'s 56.1(a)(3) Statement ¶ 70). ADP determined what taxes would be owed and prepared detailed reports for IBE reflecting each employee's pay for the month and year-to-date. ADP also informed IBE of the total dollar amount of all paychecks in the aggregate and all tax withholding in the aggregate. The payroll amount was debited from IBE's account in an aggregate number. The employee's bank, in this case Standard Bank, then credited the employee's account with the direct deposit amount. The transactions effectuating the transfer of funds from IBE's bank to McConnell's bank are not "wire

9

transfers"; rather, they are "ACH Transfers." (Id., ¶ 71). McConnell's monthly bank statements reflected the lump sum amount of her pay each month but not the amounts of profit sharing and bonuses. The ACH deposits contained no information about profit sharing, bonuses, or any other component of compensation – they contained only a lump-sum dollar amount. (Id., ¶ 72). The details of each employee's payroll – including base pay, profit sharing, bonuses and taxes – were prepared by ADP and were provided to employees in the form of an Earnings Statement that was delivered by courier to each center and hand-delivered to each employee. (Id., ¶ 73). The Earnings Statements were the only documents received by McConnell that stated the amount of profit sharing, bonuses, and other payroll information. (Id., ¶ 73).

ADP also prepared individual Earnings Statements or "pay stubs" and sample checks for each employee each month. The pay stubs detailed the employee's base salary, profit sharing, bonuses, and any other adjustments, as well as deductions for taxes and insurance. ADP delivered the pay stubs to each center via courier. Employees received their pay stubs directly at the centers each month. The pay stubs were the only documents received by employees that stated the amount of profit sharing, bonuses, and other payroll information. (Def.'s 56.1(a)(3) Statement ¶ 73).

Connie Powers was the Director of Operations for IBE from August 2003 to July 2005. Powers had no ownership interest in IBE or the Sylvan Learning Centers. Powers did not receive any profit sharing from IBE, and her compensation was not affected by the performance of IBE or the centers. (Def.'s 56.1(a)(3) Statement ¶ 75). Powers had no involvement in the procurement of AFLAC insurance or the calculations of premiums or payroll deductions. Powers had no involvement in determining the insurance deductions from McConnell's pay. (Id, ¶ 76). Powers did not have involvement in the creation or calculation of profit sharing or bonuses for McConnell or any other

10

director. Powers was employed by IBE when commissions were paid to McConnell. Powers was involved in human resource issues, such as discipline, maternity leave, and work assignments. (Id., ¶ 77; Plaint.'s Response ¶ 77).

On April 23, 2004, McConnell's employment was terminated during her previously scheduled annual performance review. McConnell's written performance evaluation identified "irreconcilable differences and the overt lack of respect for the leadership role of the officers" as the reason for her termination. Def.'s 56.1(a)(3) Statement ¶ 59).

McConnell alleges that the revenues on the commission calculation spreadsheets were different than the revenues on the Oak Lawn Center financial statements. Herrmann testified that the commission calculations were made before the financial statements were completed in order to pay the commissioners earlier. The discrepancy between the revenue numbers was because Herrmann did not have the bank charges at the time that he calculated the commissions. Since the bank statements were normally received on the 10th or 12th of the month, Herrmann used the prior month's bank charges each month, causing slight differences in each month's commissions. (Def.'s 56.1(a)(3) Statement ¶ 45). For example, McConnell's commissions for April 2000 were calculated based on $71,149.95, rather than the $71,008.56 reflected on the Oak Lawn profit and loss statement. Thus, McConnell was slightly overpaid for that month. During the thirty months in which the commission plan was in effect, there was one month in which the commissions paid to McConnell were more than $100.00 different than what they would have been had they been calculated on the actual accrual revenues of that month. In September 1999, McConnell was overpaid by $186.16 because Herrmann calculated the commissions based on a prior month's revenues. Herrmann made an adjustment the following month to account for the error in his calculation. (Id., ¶ 48). Based on Herrmann's

11

recalculation of the commissions that McConnell would have received based on the actual accrual revenues on the financial statements compared to the amounts on which the commissions were paid, excluding differences of less than $1.00, McConnell was overpaid commissions for twelve months and underpaid commissions for fourteen months. Other than the $186.16 described above, there was one month in which the difference was greater than $25.00. Over the thirty-month period, the difference is less than $100.00. (Id., ¶ 48).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c);*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain:
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including

12

> references to the affidavits, parts of the record, and other supporting
> materials relied upon.

The district court is entitled to strict compliance with Local Rule 56.1. *See Federal Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005); *Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 527 (7th Cir 2000) (strict compliance with the local rules governing summary judgment is upheld given the importance of local rules that structure the summary judgment process).

In the instant case, McConnell filed a response to Defendants' proposed statements of undisputed facts that did not comply with L.R. 56.1. Several of McConnell's responses indicated that she agreed with the proposed undisputed fact, but then McConnell included additional "facts" within that response. McConnell also "disputed" several of Defendants' proposed undisputed facts. However, McConnell failed to provide contradicting facts or record citations to some of the denials. In other denials, McConnell attempts to raise additional "facts" that are non-responsive and/or irrelevant to Defendants' proposed undisputed facts. The proposed undisputed facts that McConnell failed to properly dispute are deemed admitted.

McConnell also attempted to provide "additional facts" in support of her opposition to Defendants' motion. However, the additional facts that are provided do not comply with L.R. 56.1(b)(3)(B). Instead, the additional facts are incorporated in McConnell's eight pages of "facts" within her response brief without the use of short numbered paragraphs, as required. Accordingly, McConnell's "additional facts" are not considered because they are not presented in compliance with Local Rule 56.1(b)(3)(B).

13

Count I alleges that Defendants, through a pattern of racketeering activity, violated 18 U.S.C. § 1962(c) by deducting insurance premiums in amounts greater than that charged by the insurer and underpaying bonuses and profit sharing by falsely and fraudulently overstating or understating revenues and expenses.

Section 1962(c) provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). To prove a violation of Section 1962(c), a plaintiff must establish (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Roger Whitmore Automotive Serv., Inc. v. Lake County, Ill.*, 424 F.3d 659, 670 (7th Cir. 2005) (*Lake County*).

A pattern of racketeering activity is established if a plaintiff demonstrates continued criminal activity and a relationship between the predicate acts (racketeering activity) – a standard commonly known as the "continuity plus relationship" test. *See Lake County*, 424 F.3d at 672. Continued criminal activity, known as continuity, "is both a closed- and open-ended concept." *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 241 (1989) (*H.J., Inc.*). A closed period of racketeering includes a course of criminal conduct that has ceased. An open-ended period of racketeering includes criminal conduct that lacks duration and repetition but by its nature shows clear signs that the criminal conduct is continuing into the future. *See Lake County*, 424 F.3d at 673. Because the Defendants no longer own or operate the alleged enterprise, McConnell must demonstrate a closed scheme.

14

A closed scheme consists of a series of related predicates extending over a substantial period of time. *See H.J., Inc.*, 492 U.S. at 242. Factors relevant in determining whether a plaintiff has demonstrated a closed scheme include: (1) the number and variety of predicate acts, (2) the number of victims, (3) the length of time of the predicate acts, (4) the presence of separate schemes, and (5) the occurrence of distinct injuries. *See Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) (*Vicom*). These factors are applied with the goal of achieving a "natural and commonsense" result, consistent with Congress's concern with long-term criminal conduct to be addressed by RICO. *H.J., Inc.*, 492 U.S. at 237.

McConnell alleges only one type of predicate act – wire fraud. "The Seventh Circuit, however, does not look favorably on relying on many instances of mail and wire fraud to form a pattern." *Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990). "Mail fraud and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts . . . may be no indication of the requisite continuity of the underlying fraudulent activity. Thus, a multiplicity of mailings does not necessarily translate directly into a 'pattern' of racketeering activity.'" *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir. 1986). Allegations of only mail and wire fraud do not constitute a "variety of predicate acts" as that phrase is used in case law. *See Vicom*, 20 F.3d at 781; *see also U.S. Textiles, Inc. v. Anheuser-Busch Co.*, 911 F.2d 1261, 1266 (7th Cir. 1990) ("When it comes to a pattern premised on acts of mail or wire fraud, the volume of mailings is not dispositive."). Accordingly, McConnell has not established a variety of predicate acts.

McConnell has identified eight directors who might have been eligible for profit sharing and who might have been victimized by Defendants' alleged fraud. In her response brief, McConnell hypothesizes that the number of victims was at least twenty-eight because Defendants had seven centers and four employees at each center that could have received profit sharing. However, the proposed twenty-eight victims is merely a hypothesis as McConnell has not demonstrated that the alleged fraud also took place at the other centers.[1] Eight victims are considered a small number of victims and non-indicative of continuity. *See Lake County*, 424 F.3d at 673 (twelve victims considered a small group of victims "which does not help [plaintiff's] case for continuity").

McConnell has also alleged only a single scheme – to underpay her and other directors. McConnell attempts to show a "pattern" of different schemes by identifying "a number of different accounting devices" used to underpay certain bonuses. However, the different accounting irregularities identified by McConnell do not constitute separate schemes as that term is used in RICO. Instead, the single "overarching scheme" was to underpay McConnell and the other directors at the Oak Lawn Center. *See Lake County*, 424 F.3d at 674 (plaintiff alleged "one overarching scheme" of illegally obtaining contributions to fund election campaign); *Vicom*, 20 F.3d at 781-82 (rejecting plaintiff's claim of five different schemes because all alleged "schemes" related to one underlying scheme – to sell as much equipment as possible to increase the net worth of the company).

---

[1]McConnell attempts to demonstrate that the alleged fraud affected numerous individuals based on her allegation that each of the eight centers had four employees that participated in the profit-sharing plans. However, McConnell alleges that the scheme to defraud was carried out by inflating the expenses of the Oak Lawn Center by allocating other centers' expenses to Oak Lawn. If that allegation were true, the expenses of the other centers would be reduced, increasing the profit sharing at the other centers. McConnell has presented no evidence of any fraud affecting employees of other centers.

McConnell has also not alleged or demonstrated distinct injuries. Instead, she has alleged that she suffered identical economic injuries over a period of time from a single contract – this type of injury is insufficient to demonstrate distinct injuries. *See Vicom*, 20 F.3d at 782 (economic injury that stemmed from the same contract and similar predicate acts over a period of time does not constitute distinct injuries).

Based on the above, McConnell has not demonstrated continuity and cannot demonstrate a pattern of racketeering. *See Lake County*, 424 F.3d at 675 (affirming district court's finding of lack of continuity and granting of summary judgment).

Nor has McConnell demonstrated the predicate act of wire fraud. Wire fraud applies to the use of wires "for the purpose of executing [a] scheme or artifice" to defraud. 18 U.S.C. § 1343. To establish wire fraud, McConnell must demonstrate: (1) a scheme to defraud, (2) with the intent to defraud, and (3) the use of interstate wires in furtherance of the scheme to defraud. *See American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534, 542 (7th Cir. 1999) (*Fishman*).

McConnell has failed to demonstrate that genuine issues of material fact exist as to Defendants' intent to defraud or that interstate wires were used in furtherance of the scheme to defraud.

Summary judgment is appropriate in RICO cases where there is no evidence from which a reasonable juror could find intent to defraud. *See Fishman*, 175 F.3d at 543. "Intent to defraud requires a wilful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).

In support of her argument of intent, McConnell argues that the Defendants should have been able to tell from the financial statements that something was amiss. However, this is mere speculation and is contrary to McConnell's also receiving the same reports and not identifying any errors. Furthermore, questions concerning the reports and bonuses received from employees were readily addressed, and any errors were corrected. In addition, the "errors" identified by McConnell sometimes resulted in McConnell's receiving more of a bonus than what was actually earned.

McConnell also argues that intent is demonstrated by Defendants' deliberately not checking the AFLAC premiums, which indicated the correct amount of her insurance premiums. However, the amount of insurance premiums withheld from McConnell's paycheck was specifically identified on the PDA; McConnell never identified the error. Upon learning of the error, Defendants attempted to return the extra withheld premiums; and AFLAC concluded that Defendants were correct in deducting the amount of premiums that were authorized on the PDA.

Based on the above, McConnell has failed to demonstrate that a genuine issue of material fact exists as to whether the Defendants intended to defraud.

Significantly, no genuine issue of material fact exists as to whether Defendants used a wire service in furtherance of the scheme to defraud. The defendant must use the mail or wire service "for the purpose of executing the scheme." *McDonald v. Schencker*, 18 F.3d 491, 494 (7th Cir. 1994). Mailings are in furtherance of the scheme if they are "incident to an essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954) (*Pereira*). "The federal mail [or wire] fraud statute does not purport to reach all frauds, but only those limited instances in which the use of mails [or wires] is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." *Kann v. United States*, 323 U.S. 88, 94 (1944) (*Kann*).

18

For example, corporate officers who were accused of setting up a dummy corporation to divert funds and who wrote checks payable to themselves and cashed or deposited the checks in a bank, knowing that they would be mailed to the drawee bank in another state, were not guilty of mail fraud because the mailings were not for the purpose of executing the scheme to defraud. *See Kann*, 323 U.S. at 94. "It was immaterial to [the defendant], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Kann*, 323 U.S. at 94. Similarly, in *Parr v. United States*, 363 U.S. 370, 390 (1960), no mail fraud was found because the mailing of sales drafts for stolen gas credit cards were not fraudulent themselves, and the mailing was immaterial to the defendant how the oil company collected its payments for credit card purchases.

On the other hand, a bank deposit that furthers the scheme or is incidental to an essential part of the scheme is in furtherance of the scheme. In *Pereira*, mail fraud was established because, in furtherance of the defendant's scheme to defraud his wife of $35,000, the defendant caused a California bank to mail him a check for $35,000, and then he deposited that check in Texas. The mailing of the check by the bank and the cashing of the check were both essential to the scheme to defraud. *Pereira*, 347 U.S. at 8-9.

In the instant case, assuming that the deposits traveled interstate[2], the alleged interstate wire was the direct deposit of McConnell's salary in her bank account. It is undisputed that the deposits did not contain any information other than the lump sum to be deposited. The alleged fraud took place prior to the payment of the salary based on the fraudulent financial reports, and the pay stubs that identified the different payments and withholdings did not travel interstate. The alleged

---

[2]The parties dispute whether the deposits traveled interstate, and neither party provided sufficient evidence to make the determination for purposes of summary judgment.

fraudulent financial reports and pay stubs were essential to the alleged scheme of miscalculating the amount of the bonuses and commissions. However, the lump-sum payment of McConnell's salary was not pertinent to the alleged scheme of miscalculating the amount of bonuses and was not essential to the alleged scheme to defraud her of her earned bonuses and commissions. Furthermore, the lump-sum payment did not conceal the alleged fraud or hinder McConnell from discovering the alleged fraud. Specific information as to base pay, profit sharing, bonuses and taxes was provided to McConnell in an Earnings Statement that was hand-delivered by a private courier.

McConnell cites to *United States v. Alhalabi*, 443 F.3d 605 (7th Cir. 2006) (*Alhalabi*) in support of her argument that merely depositing the resulting salary via an interstate wire is sufficient to demonstrate "in furtherance of the scheme to defraud." However, that case is readily distinguished. In *Alhalabi*, the defendant purchased food stamps at less than face value and had the proceeds deposited by ACH transfer into his account. The purchase of the food stamps, which was implemented by swiping the food stamp card electronically, inexorably led to the electronic deposit. The Seventh Circuit, without addressing or discussing the "in furtherance of" requirement, upheld the denial of the defendant's motion to dismiss the indictment. *Alhalabi*, 443 F.3d at 609.

Based on the above, McConnell has not demonstrated that the deposits of her salary in her bank account (wires) were in furtherance of the alleged scheme to defraud her of her full bonuses and commissions.

20

## CONCLUSION

For the foregoing reasons, McConnell has failed to demonstrate that genuine issues of material fact exist as to whether the Defendants engaged in a pattern of racketeering. Accordingly, Defendants' Motion for Summary Judgment is granted.

Dated: August 21, 2006

JOHN W. DARRAH
United States District Court Judge